UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK CHARLES GODFREY,<br><br>                             Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of<br>Social Security,<br><br>                             Defendant. | Case No.: 20-CV-917-WVG<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

This is an action for judicial review of a decision by the Commissioner of Social Security, Andrew Saul, denying Plaintiff Mark Charles Godfrey supplemental security income ("SSI") benefits under Title XVI of the Social Security Act (the "Act") and Social Security Disability Insurance under Title II of the Act. The parties have filed cross-motions for summary judgment. For the reasons stated below, the Court GRANTS Plaintiff's motion for summary judgment and DENIES Defendant's cross-motion for summary judgment.

/ / /

/ / /

/ / /

/ / /

## I.   OVERVIEW OF SOCIAL SECURITY CLAIM PROCEEDINGS

### A. The SSA's Sequential Five-Step Process

In order to determine whether an individual is eligible for benefits, the SSA utilizes a sequential five-step evaluation. 20 C.F.R §§ 416.920, 404.1520. In order to qualify for disability benefits under the act, a claimant (1) must suffer from a medically determinable impairment[1] which has lasted or is likely to last for a continuous period of twelve months or more or can be expected to result in death and (2) the medical impairment must leave the claimant unable to perform the work he or she previously performed or other substantially gainful employment. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A); 1382(c)(3)(A).

The claimant bears the burden of proving he or she "either was permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which [his or] her disability insured status expired." *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995.) An administrative law judge ("ALJ") utilizes the five-step evaluation to make a determination of disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the Commissioner determines a claimant is not disabled at any step in this process, the review process is terminated at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

In step one of the sequential evaluation, the ALJ considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). The disability benefits will be denied by an ALJ if the claimant is engaged in "substantial gainful activity." *Id*. §§ 404.1520(b), 416.920(b).

If a claimant is unable to provide proof of gainful work activity, the ALJ proceeds to step two. In step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. The so-called "severity regulation" dictates

---

[1] A medically determinable physical or mental impairment "is an impairment that results from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

the course of this analysis. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

A claimant's disability claim will be denied by the ALJ if the ALJ does not find the claimant suffers from a severe impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do "basic work activities." 20 C.F.R. § 404.1520(c). The ability to do "basic work activities" means "the abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b).

If the ALJ finds there is a severe impairment or combination of impairments, the ALJ will proceed to step three of the evaluation. At step three, the claimant's impairment or combination of impairments is analyzed to determine whether it is equivalent to one of the listed impairments acknowledged by the SSA to be so severe as to prevent the claimant from engaging in substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). So long as the impairment meets or equals one of the listed impairments, an ALJ conclusively presumes a claimant is disabled. *Id.* § 404.1520(d).

Between the third and fourth step, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Id.* §§ 404.1520(e), 404.1545(a). A claimant's RFC is his or her ability to do physical and mental work activities despite limitations caused by his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis considers "whether [the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). In order to determine a claimant's RFC, the ALJ will consider the relevant evidence and the claimant's collection of impairments, including those considered non-severe. *Id.* § 404.1545(a)(3)(e). The evaluation will continue to step four if the ALJ does not determine a claimant's impairment or combination of impairments is disabling at step three.

At step four, the ALJ determines whether the claimant can perform the requirements of his or her past relevant work considering the claimant's RFC. *Id.* § 404.1520(f). If the claimant has the RFC to continue his or her past relevant work, the claimant is not disabled.

*Id*. § 404.1560(b)(3). However, if the claimant cannot perform past work or does not have any past relevant work, the ALJ will move forward with the analysis.

At the final step, the ALJ will consider whether the claimant is able to do any other work when looking at his or her RFC, age, education, and work experience. *Id*. § 404.1520(g). If the claimant is capable of doing other work, the claimant is not disabled. If the claimant is not able to perform other work and meets the duration requirement, the claimant is disabled. Id. At step five, although the claimant still generally continues to have the burden of proving disability, a limited burden will shift to the SSA. At this stage, the SSA must present evidence demonstrating that other work that the claimant can perform exists in significant numbers in the national economy. *Id*. §§ 404.1520, 1560(c), 416.921, 404.1512(f).

## B. SSA Hearings and Appeals Process

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. There is a four-step process for administrative review of a claimant's application for disability payments through the SSA regulations. See *id*. §§ 416.1400, 404.900. After the SSA makes an initial determination, there are three more levels of appeal: (1) reconsideration, (2) hearing by an ALJ, and (3) review by the Appeals Council. *See id*. §§ 416.1400, 404.900. The claimant has sixty days following an unsatisfactory decision at any step of the process to seek administrative review. *See id*. §§ 404.933, 416.1433. If the claimant does not request review, the decision becomes the SSA's binding and final decree. *See id*. §§ 404.905, 416.1405.

The applications for disability benefits are initially processed by SSA field offices and state disability determination services. Once a claimant completes both an application and an adult disability report and submit those documents to a SSA field office, the process begins. If the claim is initially denied by the SSA, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id*. §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id*. § 404.900(b).

The claimant may request the ALJ's decision be reviewed by the Appeals Council if the ALJ reaches an unfavorable decision. *Id*. §§ 404.967, 416.1467. The Appeals Council will either grant, deny, dismiss, or remand a claimant's request. *Id*. §§ 416.1479, 404.979. The claimant may seek judicial review in a federal district court if the Appeals Council reaches an unfavorable decision to the claimant or the Appeals Council denies review of the claim. *See id*. §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either decide the matter or refer it to another ALJ. *Id*. § 404.983.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff is a 52-year-old man who claims he is too disabled to work. (AR 19.) On July 4, 2016, Plaintiff filed a Title II application for a period of disability and disability benefits. (AR 161-62.) Additionally, he filed a Title XVI application for supplemental security income on January 6, 2017. (AR 163-68.) He alleges that his disability began on July 30, 2010. (AR 163.) On September 8, 2016, the SSA denied the initial claims. (AR 60-69.) The SSA denied his claims upon reconsideration. (AR 70-81, 82-92.) Plaintiff requested a hearing before an ALJ. (AR 109-10.) This hearing took place on January 16, 2019. (AR 34-59.) On March 18, 2019, the ALJ issued an unfavorable decision. (AR 16-18.) The Appeals Council denied Plaintiff's request for review on March 17, 2020. (AR 1-6.) On March 12, 2021, Plaintiff filed the complaint in the instant case seeking review of the ALJ decision.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**B.     Medical Overview**

In January 2013, Plaintiff was first seen at UCSD Medical Center (UCSD) for splenic vein thrombosis,[2] renal cell carcinoma,[3] pancreatitis,[4] pancreatic pseudocysts,[5] diabetes mellitus,[6] and hypertension.[7] (AR 449.) Plaintiff reported drinking ten beers daily for the past twenty years.[8] (AR 408.) In February 2015, Plaintiff went to UCSD as he was

_____

[2] Splenic vein thrombosis is blood clotting within the splenic vein. National Center for Biotechnology Information, U.S. National Library of Medicine. https://www.ncbi.nlm.nih.gov/books/NBK553170/.

[3] Renal cell carcinoma is a form of kidney cancer. Renal cell carcinoma begins in the lining of the renal tubules in the kidney, which filter the blood and produce urine. National Cancer Institute,     https://www.cancer.gov/publications/dictionaries/cancer-terms/def/renal-cell-carcinoma.

[4] Pancreatitis is the swelling of the pancreas, which is responsible for producing enzymes to assist with digestion and hormones that regulate how your body processes sugar. Mayo Clinic,           https://www.mayoclinic.org/diseases-conditions/pancreatitis/symptoms-causes/syc-20360227.

[5] Pancreatic pseudocysts are caused by the inflammation of the pancreas or form when the pancreas becomes injured and pancreatic enzymes start to leak, which harms the tissue of the pancreas. This may also be caused by acute pancreatitis. John Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/pancreatic-pseudocysts#:~:text=Pseudocysts%20form%20when%20the%20cells,pancreatitis%20can%20also%20get%20pseudocysts.

[6] Diabetes mellitus is "a disorder of carbohydrate metabolism in which sugars in the body are not oxidized to produce energy due to lack of the pancreatic hormone insulin." Oxford Reference, https://www.oxfordreference.com/view/10.1093/oi/authority.20110803095715505.

[7] Hypertension is high blood pressure, which is caused by your blood pushing against the walls of your blood vessels at too great of a speed. https://www.heart.org/en/health-topics/high-blood-pressure/the-facts-about-high-blood-pressure/what-is-high-blood-pressure.

[8] This number varied throughout the medical record.

experiencing abdominal pain with nausea. (AR 605.) He denied drinking heavily but had one beer earlier that day. (AR 625.) Plaintiff stated he was not interested in treatment information for alcoholism despite being informed by his physician that even one beer could place him in the hospital. (*Id*.) In May 2015, Plaintiff returned to the medical center for acute abdominal pain caused by a pancreatitis "flare up." (AR 599.) During these flare ups, Plaintiff experienced severe abdominal pain and claimed loss of appetite causing significant weight loss. (*Id*.) On this visit, Plaintiff stated he was one month sober, had been following his diet, and had been staying away from vigorous exercise. (*Id*.)

According to the Plaintiff's work history, he has not been employed since April 2015. (AR 258.) His last reported job was working as a gas station cashier from January 2015 to April 2015. (*Id*.)

In March 2016, Plaintiff went to the Palomar Health emergency room complaining of abdominal pain and vomiting. (AR 1503.) In the medical reports, the physician notes that Plaintiff appeared thin. (AR 1506.) Plaintiff stated that he was experiencing a loss of appetite. (AR 1505.) While in the hospital, an ultrasound of the abdomen was performed, which revealed multiple calcified and cystic areas on the pancreas. (AR 1531.) Next, the hospital performed a Flow Cytometry Analysis,[9] which revealed mild phenotypic abnormalities. (AR 1524.) Palomar also performed a computed tomography (CT)[10] Guided

---

[9] "Flow Cytometry is a technique used to detect and measure physical and chemical characteristics of a population of cells and particles. In this process, a sample containing cells or particles is suspended in a fluid and injected into the flow cytometer instrument." NanoCellect, https://nanocellect.com/blog/how-does-flow-cytometry-work/.

[10] A computerized tomography scan uses the computer to create cross-sectional images of the bones, blood vessels, and soft tissue. It does so by combining several X-ray images. Mayo Clinic, https://www.mayoclinic.org/tests-procedures/ct-scan/about/pac-20393675.

Bone Marrow Biopsy.[11] (AR 1528.) The physicians diagnosed Plaintiff with pancytopenia[12] and mildly hypocellular bone marrow[13] with a moderate erythroid hyperplasia.[14] (AR 1528.)

In April 2016, Plaintiff returned to the Palomar Health emergency room for muscle weakness and pain. (AR 1534.) A CT scan of his abdomen and pelvis was performed, revealing signs of wall thickening of the distal esophagus. (AR 1596.) The CT revealed pancreatic pseudocyst, esophagitis,[15] and gastritis[16] caused by chronic drinking. (AR 1597.)

Although Plaintiff initially went to UCSD in 2013, surgery for his pancreatitis had been delayed. (AR 458.) In June 2016, Plaintiff stated he was ready for surgery, and he underwent a surgical procedure in the hopes of lessening his abdominal pain. (*Id*.) The

---

[11] A CT-guided bone marrow biopsy inserts a needle into the pelvic bone to retrieve a sample of bone and bone marrow. Cancer Treatment Centers of America, https://www.cancercenter.com/diagnosing-cancer/diagnostic-procedures/biopsy.

[12] Pancytopenia occurs when there is a reduced number of red and white platelets in the blood. This can cause exhaustion, dizziness, accelerated heartbeat, fever, rash, pale skin, abnormal bleeding, weakness, difficulty breathing, and purple or red spots on the skin.

[13] Hypocellular bone marrow is bone marrow with a decreased number of cells typical of bone marrow. Pathology Dictionary, https://www.mypathologyreport.ca/hypocellular/#:~:text=Hypocellular%20is%20a%20term%20pathologists,and%20malignant%20(cancerous)%20tumours.

[14] Erythroid hyperplasia occurs when there is an excessive number of erythroid precursor cells, which are immature red blood cells, in the bone marrow. Medigoo, https://www.medigoo.com/articles/erythroid-hyperplasia/.

[15] Esophagitis is the inflammation of the esophagus, which may cause damage to the tissues within the esophagus and can cause painful swallowing. Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/esophagitis/symptoms-causes/syc-20361224#:~:text=Esophagitis%20(uh%2Dsof%2Duh,difficult%20swallowing%20and%20chest%20pain.

[16] Gastritis is the swelling of the protective stomach lining. Healthline, https://www.healthline.com/health/gastritis.

procedure included an exploratory laparotomy,[17] lateral pancreaticojejunostomy (Puestow procedure),[18] splenectomy,[19] distal pancreatectomy,[20] and a partial gastrectomy.[21] (AR 388.) Physicians indicated that his pancreas had become inflamed and pseudo cystic. (*Id.*) Additionally, there were dense adhesions between the pseudocyst and the spleen. (*Id.*) Following his procedure, Plaintiff participated in physical therapy. (AR 399-400.) Plaintiff struggled with walking due to weakness in his legs, and it was recommended he use a front wheeled walker to avoid falls. (AR 407.)

Following surgery, Plaintiff was evaluated for lower extremity weakness and shoulder pain. (AR 993.) A brain MRI was ordered, which revealed there were no acute or subacute infarcts. (AR 994.) There was scattered T2/FLAIR white matter hyperintensities

---

[17] An exploratory laparotomy is used by physicians to find issues within the abdomen that testing is unable to show. It requires an incision be made in the abdomen. Saint Luke's, https://www.saintlukeskc.org/health-library/exploratory-laparotomy.

[18] During a lateral pancreaticojejunostomy, "the abdomen is opened with an incision from the lower breastbone to the belly button. The pancreas is exposed and the main pancreatic duct is opened from the head to the tail of the pancreas. The opened pancreatic duct is then connected to a loop of small intestine so that the pancreas drains directly into the intestines." MUSC Health, https://muschealth.org/medical-services/ddc/patients/gi-surgery/chronic-pancreatitis-surgery/puestow-procedure.

[19] Splenectomy is the removal of the spleen. Mayo Clinic, https://www.mayoclinic.org/tests-procedures/splenectomy/about/pac-20395066.

[20] A distal pancreatectomy is a surgical procedure to remove a tumor from the pancreas. Memorial Sloan Kettering Cancer Center, https://www.mskcc.org/cancer-care/patient-education/about-your-distal-pancreatectomy.

[21] A partial gastrectomy is a procedure utilized by physicians to remove a portion of the stomach. This is a method to treat stomach cancer. Mofitt Cancer Center, https://moffitt.org/cancers/stomach-gastric-cancer/treatment/surgery/partial-gastrectomy/#:~:text=A%20partial%20gastrectomy%20is%20a,cancer%20and%20benign%20stomach%20tumors.

which may represent chronic hypertensive changes.[22] (*Id*.) The examination of the left shoulder revealed a normal left shoulder. (*Id*.) Additionally, the hospital evaluated the tubes using a single supine abdominal radiograph.[23] (AR 993.) The radiograph revealed the tip of the nasogastric tube projects over the gastric fundus with side port at the gastroesophageal junction.[24] (*Id*.) Based on this, the physician recommended advancing the tip to the gastric body. (*Id*.) When Plaintiff returned for a follow-up, he continued to report persistent numbness in his feet. (AR 978.) Plaintiff had been taking Gabapentin[25] which he reported as helping with the severity of his symptoms. (*Id*.) Upon examination of Plaintiff's surgical incision, the physician noted it was healing nicely. (AR 981.) Although the Plaintiff was reporting postprandial discomfort, gas, and bloating, the physician did not indicate this was concerning. (*Id*.)

In August of 2016, Plaintiff went to Family Health Centers of San Diego reporting daily abdominal pain. (AR 1002.) Additionally, he reported being unable to raise his left shoulder above the midline. (*Id*.) The physician examined his abdomen and noted the

---

[22] The impact of T2/ FLAIR white matter hyperintensities is still speculative. "White matter hyperintensities (WMH) lesions on T2/FLAIR brain MRI are frequently seen in healthy elderly people. Whether these radiological lesions correspond to irreversible histological changes is still a matter of debate. National Center for Biotechnology Information, U.S. National Library of Medicine. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3893472/.

[23] A supine abdominal radiograph is an abdominal x-ray performed while the patient lays in a supine position. Radiopaedia, https://radiopaedia.org/articles/abdomen-ap-supine-view-1?lang=us.

[24] "A correctly placed nasogastric tube should: descend in the midline, following the path of the esophagus and avoiding the contours of the bronchi, clearly bisect the carina or bronchi, cross the diaphragm in the midline, and have its tip visible below the left hemidiaphragm." Radiopedia, https://radiopaedia.org/articles/nasogastric-tube-positioning?lang=us.

[25] Gabapentin is an oral medication used to treat restless leg syndrome. Medline Plus, https://medlineplus.gov/druginfo/meds/a694007.html.

20-CV-917-WVG

surgical scar was tender to palpation, but there was no discharge or sign of infection. (*Id.*) Although the abdomen was tender, there was no rebound or guarding. (*Id.*) On August 22, 2016, Plaintiff went to the Palomar Health emergency room after experiencing a fall, which caused him to experience right rib pain. (AR 1656.) Plaintiff stated that while taking out the garbage, he slipped on a wheelchair ramp, landed on the sidewalk, and struck his head. (*Id.*) The physician diagnosed Plaintiff with a nondisplaced rib fracture.[26] (AR 1656.) Nine days later, Plaintiff returned to the Palomar Health emergency room complaining of left knee pain. (AR 1848.) The physician found that Plaintiff had internal derangement of the left knee.[27] (*Id.*) The physician gave Plaintiff a knee immobilizer and crutches. (*Id.*) Additionally, Plaintiff was prescribed hydrocodone[28] for the pain. (AR 1869.) In September, Plaintiff went to UCSD complaining about his knee pain. (AR 986.) The physician gave Plaintiff a new brace that would increase mobility and initiated physical therapy. (*Id.*)

On September 9, 2016, Plaintiff returned to UCSD complaining of left shoulder pain. (AR 986.) The physician initiated physical therapy. (*Id.*) On September 15, Plaintiff went to Family Health Centers of San Diego complaining of his left shoulder pain. (AR 1030.) Plaintiff was diagnosed with frozen shoulder[29] and was referred to physical therapy. (*Id.*)

---

[26] A rib fracture is a breaking of the rib. A non-displaced rib fracture is typically a hairline or simple fracture. The American Association for the Surgery of Trauma, https://www.aast.org/resources-detail/rib-fractures.

[27] Internal knee derangement prevents normal knee function. It is a chronic condition which may cause the knee flexibility to be limited, knee instability, and pain. Healthline, https://www.healthline.com/health/internal-derangement-of-knee#TOC_TITLE_HDR_1.

[28] Hydrocodone interacts with the central nervous system to relieve pain. Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089.

[29] Frozen shoulder is a condition which causes pain and stiffness in the shoulder. Those who are recovering from a procedure are at a higher risk of developing frozen shoulder.

In October 2016, Plaintiff complained of right shoulder pain. (AR 1026.) After running tests on his right shoulder, the physician found that Plaintiff had a normal right shoulder. (*Id.*)

In November 2016, Plaintiff returned to Palomar Health emergency room complaining of abdominal pain, nausea, and vomiting. (AR 1890.) The physician performed an abdominal/KUB x-ray. (AR 1892.) The x-ray revealed that there was wall thickening in the focal loop of the dilated small bowel in the left upper quadrant.[30] (*Id.*) The physician sent Plaintiff home with instructions to return if he experienced further pain. (AR 1893.) The physician prescribed Plaintiff hydrocodone and ondansetron.[31] (AR 1896.)

In August 2016, Plaintiff reported feeling anxious to Family Health Centers of San Diego. (AR 1003.) He was prescribed Ativan[32] and referred to mental health for therapy. (*Id.*) In September 2016 Plaintiff attended his first therapeutic appointment. (AR 1014.) He reported worsening depression since his surgery. (*Id.*) Additionally, he had been living in a group home since his surgery, which he claims negatively affected his mood. (*Id.*)

---

Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/frozen-shoulder/symptoms-causes/syc-20372684.

[30] "Focal bowel wall thickening may be caused by tumors or inflammatory conditions. Bowel tumors may appear as either regular and symmetric or irregular or asymmetric thickening. When fat stranding is disproportionately more severe than the degree of wall thickening, inflammatory conditions are more likely. With the exception of lymphoma, segmental or diffuse wall thickening is usually caused by benign conditions, such as ischaemic, infectious and inflammatory diseases." National Center for Biotechnology Information, U.S. National Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3999365/#:~:text=Focal%20bowel%20wall%20thickening%20may,inflammatory%20conditions%20are%20more%20likely.

[31] Ondansetron is a drug prescribed to prevent nausea and vomiting. Medline Plus, https://medlineplus.gov/druginfo/meds/a601209.html#:~:text=Ondansetron%20is%20used%20to%20prevent,may%20cause%20nausea%20and%20vomiting.

[32] Ativan is used to treat anxiety disorder and help those who have trouble sleeping. Medical News Today, https://www.medicalnewstoday.com/articles/326015#about.

Plaintiff stated that he had been feeling tense and frustrated, had racing thoughts at night, and had lost interest in spending time with others. (AR 1014.) The therapist noted that the Plaintiff appeared tense with poor concentration. (AR 1015.) However, the therapist listed only mild symptoms of generalized anxiety disorder and unspecified depressive disorder. (AR 1016.) Plaintiff was prescribed Celexa[33] and was told to continue taking Ativan. (AR 2015.)

In February 2017, Plaintiff went to the Palomar Health emergency room with abdominal pain, which Plaintiff reported had been occurring on and off for about a month. (AR 1952.) There was no associated nausea, vomiting, diarrhea, or constipation. (*Id*.) After an assessment was performed, the physician found that Plaintiff was not suffering from an acute surgical abdomen. (AR 1955.) Following this interaction, Plaintiff went to Advanced Pain & Rehab Center of San Diego and received comprehensive Pain Management Consultation. (AR 1143.) At this appointment, Plaintiff reported feeling "blue" but denied having anxiety, depression, mood swings, nervousness, or sleep deprivation. (*Id*.)

On March 15, 2017, Plaintiff went to Family Health Centers of San Diego Adult Rehabilitation for physical therapy for his shoulder. (AR 1324.) The physical therapist noted that the shoulder pain "is consistent with deconditioning, disuse, adhesive capsulitis bilateral." (AR 1326.) Then, the Plaintiff returned to UCSD now nine months out from his previous surgery complaining of epigastric pain and nausea. (AR 1173.) The physician noted that Plaintiff looked well and believed it was apparent that Plaintiff benefited from the surgery. (*Id*.) Later that month, Plaintiff had a follow-up with the pain management team at Advanced Pain & Rehab Center. (AR 1149.) He was taken off Norco[34] and

---

[33] Celexa is a selective serotonin reuptake inhibitor which is used to treat depression. Drugs.com, https://www.drugs.com/celexa.html.

[34] Norco is a prescription drug used to treat moderate to severe pain. Rxlist, https://www.rxlist.com/norco-drug.htm.

prescribed Percocet[35] for his pain. (*Id*.) Again, Plaintiff reported feeling blue, but records indicate he denied feelings of anxiety, depression, mood swings, nervousness, or sleeping difficulty. (AR 1148.)

In April 2017, Plaintiff went to the Palomar Health emergency room after falling while trying to use the bathroom in the middle of the night. (AR 1985.) He slipped and hit his head on the dresser. (*Id*.) The Plaintiff reported that he lost consciousness and awoke a few minutes later, bleeding from his head. (*Id*.) Plaintiff went to the emergency room four additional times during April 2017 for similar syncopal episodes.[36] (AR 1708, 1741, 1136.)

In May 2017, Plaintiff went to the Palomar Health emergency room reporting nausea, vomiting, and diarrhea. (AR 1810.) At this time, Plaintiff was drinking daily and the physician noted he "suspects [Plaintiff's] symptoms are likely due to continued alcohol abuse with possible pancreatic insufficiency."[37] (AR 1813.) Plaintiff then went to Family Health Centers of San Diego again reporting nausea, vomiting, and diarrhea. (AR 1127.) Additionally, Plaintiff reported that he had fallen five days prior. (*Id*.) At this visit, the

---

[35] Percocet is a prescription drug used to help treat moderate to severe pain. Rxlist, https://www.rxlist.com/percocet-drug.htm.

[36] Syncopal episode is the medical term for fainting or passing out. Healthline, https://www.healthline.com/health/syncopal-episode.

[37] Pancreatic insufficiency occurs when the pancreas is no longer producing enough of an enzyme used by the body to digest food. Medical University of South Carolina, https://muschealth.org/medical-services/ddc/patients/digestive-diseases/pancreas/pancreatic-insufficiency.

physicians considered whether Plaintiff had Addison's Disease[38] and Bacterial gastroenteritis.[39] (AR 1128.)

Plaintiff was analyzed at Sharp Hospital for his syncopal episodes after reporting an additional loss of consciousness in June 2017. (AR 1229.) Sharp found that these episodes were likely caused by "orthostasis from dehydration secondary to underlying diabetes and chronic alcoholism." (AR 1232.) Later in June, Plaintiff returned to Advanced Pain & Rehab. (AR 2399.) While it was noted that Plaintiff complained of sleep problems and he was under care for depression and anxiety, it also stated that Plaintiff denied feeling anxiety, depression, mood swings, nervousness, and sleeping difficulty. (AR 2400.) Plaintiff then returned to Family Health Centers of San Diego after experiencing another fall the day before and fecal incontinence.[40] (AR 1119.) After this initial report, Plaintiff returned and reported defecating in bed while sleeping and was prescribed adult diapers. (AR 1117.) On June 26, 2017, Plaintiff was found unconscious in the bathroom of a Target, and he was administered fluids for dehydration. (AR 1840, 1843.)

In July 2017, Plaintiff returned to Family Health Centers of San Diego still complaining of diarrhea. (AR 1105.) He was provided with a consultation. (AR 1171.)

---

[38] Addison's disease, also known as adrenal insufficiency, occurs when your body does not produce enough cortisol or aldosterone. This is an uncommon disorder. Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/addisons-disease/symptoms-causes/syc-20350293#:~:text=Addison's%20disease%2C%20also%20called%20adrenal,%2C%20often%2C%20too%20little%20aldosterone.

[39] Bacterial gastroenteritis is a problem with digestion caused by bacteria. The symptoms include cramping of the abdomen, vomiting, nausea, fever, and pain. Cedars-Sinai, https://www.cedars-sinai.org/health-library/diseases-and-conditions.

[40] Fecal incontinence is the inability to control bowel movements, which causes feces to leak. Mayo Clinic, https://www.google.com/search?q=what+is+fecal+incontinence&oq=what+is+fecal+in&aqs=chrome.0.0j69i57j0i390l3.13061j0j4&sourceid=chrome&ie=UTF-8.

Plaintiff left this consultation early, but the physician discussed diet and lifestyle modification with Plaintiff. (AR 1172.)

In August 2017, Plaintiff was tested for adrenal insufficiency and was found not to be adrenal insufficient. (AR 1435.) Plaintiff returned to the Palomar Health emergency room after being assaulted. (AR 2034.) The physician reported that Plaintiff "fell on his right side on a tilted surface from a standing height. He did sustain hits to his head with closed fists. Currently he admits to right hip pain, right leg pain, and head pain." (*Id*.) On August 25, Plaintiff underwent a right hip replacement.[41] (AR 2033.) A head CT was performed, which demonstrated presumed subarachnoid blood in the right parietal region.[42] (AR 2036.) Additionally, Plaintiff suffered an "acute, subcapital right femoral neck fracture, with mild displacement, and moderate apex superolateral angulation."[43] (*Id*.) Plaintiff was given a prescription of Celebrex[44] for pain. (*Id*.)

---

[41] "In a total right hip replacement (also called total hip arthroplasty), the damaged bone and cartilage is removed and replaced with prosthetic components. The damaged femoral head is removed and replaced with a metal stem that is placed into the hollow center of the femur. The femoral stem may be either cemented or 'press fit' into the bone. A metal or ceramic ball is placed on the upper part of the stem. This call replaces the damaged femoral head that was removed. The damaged cartilage surface of the socket is removed and replaced with a metal socket. Screws or cement are sometimes used to hold the socket in place. A plastic, ceramic, or metal spacer is inserted between the new ball and the socket to allow for a smooth gliding surface." OrthoInfo, https://orthoinfo.aaos.org/en/treatment/total-hip-replacement/.

[42] The subarachnoid space is the space between the brain and the surrounding membrane. A bleed in this region can cause death or permanent damage to the brain. Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/subarachnoid-hemorrhage/symptoms-causes/syc-20361009.

[43] A subcapital femoral fracture extends through the femur's head and neck junction. Radiopedia, https://radiopaedia.org/articles/subcapital-fracture?lang=us.

[44] Celebrex is an anti-inflammatory drug. Drugs.com, https://www.drugs.com/celebrex.html.

In October 2017, Plaintiff returned to the Palomar Health emergency room after experiencing a fall. (AR 2090.) An x-ray of his right hip revealed a superior dislocation of the right hip arthroplasty[45] and old right inferior pubic ramus deformity.[46] (AR 2091.) A closed reduction for artificial hip dislocation[47] was performed to correct the problem. (AR 2094.) Plaintiff returned to Palomar Health emergency room later that month for diarrhea. (AR 2139.) He stated that he had taken Imodium[48] without relief. (*Id.*) Additionally, he reported generalized abdominal pain with mild nausea. (*Id.*) Further, Plaintiff fell while getting out of bed, landed on his back, and reported right shoulder and upper back pain. (*Id.*) On this visit, Plaintiff was diagnosed with a scapular fracture[49] and gastroenteritis.[50] (AR 2143.)

---

[45] A hip dislocation occurs when the femoral head is pushed out of the socket. Hospital for Special Surgery, https://www.hss.edu/condition-list_hip-dislocation.asp.

[46] The pubis is formed by two bones referred to as the superior ramus and the inferior ramus. Upswing Health, https://upswinghealth.com/conditions/pubic-ramus-fracture/.

[47] During a closed reduction of the hip procedure, the femur is manipulated to correct a hip dislocation without a surgical procedure. Nicklaus Children's Hospital, https://www.nicklauschildrens.org/treatments/hip-surgery-closed-and-open-reduction-of-developme.

[48] Imodium makes the muscles located in the intestines contract more slowly, which slows the advancement of food and fluids. Healthline, https://www.healthline.com/health/diarrhea/imodium.

[49] A scapular fracture is a fracture of the shoulder blade. John Hopkins, https://www.hopkinsmedicine.org/health/conditions-and-diseases/scapula-fracture-shoulder-blade-fracture#:~:text=What%20is%20a%20scapula%20fracture,from%20the%20%20back%20or%20side.

[50] Also commonly called the stomach flu, gastroenteritis occurs when the lining of the intestines becomes inflamed. This is commonly caused by a virus, bacteria, or parasite. Medline Plus, https://medlineplus.gov/gastroenteritis.html.

In December 2017, Plaintiff returned to Advanced Pain & Rehab Center of San Diego for pain management assistance. (AR 2380.) He was prescribed oxycodone.[51] (*Id*.)

At the end of 2017, Plaintiff returned to therapy. (AR 1321-22, 1308.) In an Adult Behavioral Health Assessment performed in July 2017, a therapist noted Plaintiff's case presented moderate clinical complexity which indicates Plaintiff was suffering from an alcohol or drug disorder. (AR 1321.) In addition, it could indicate that he suffered from a major mood disorder which was stabilized by medication. (*Id*.) Further, the therapist noted Plaintiff was suffering from severe life circumstances. (*Id*.) This would indicate that Plaintiff was experiencing environmental stressors. (*Id*.) The physician listed Plaintiff's symptoms as anxiety, depression, and daily attention and concentration problems. (AR 1322.) In September 2017, a therapist performed a follow-up psychiatric evaluation and noted only mild symptoms. (AR 1308.)

On January 29, 2018, Plaintiff went to the UCSD gastroenterology department reporting abdominal pain. (AR 1484.) Plaintiff stated he essentially has constant epigastric[52] and suprapubic[53] pain to some degree. (*Id*.) In order to evaluate this better, the physician ordered a Magnetic resonance cholangiopancreatography (MRCP),[54]

---

[51] Oxycodone is a prescribed medication used to treat moderate to severe pain. Medline Plus, https://medlineplus.gov/druginfo/meds/a682132.html.

[52] Epigastric pain is pain in the upper abdomen. Healthline, https://www.healthline.com/health/epigastric-pain#:~:text=Epigastric%20pain%20is%20a%20name,t%20always%20cause%20for%20concern.

[53] Suprapubic pain is pain in the lower abdomen. Healthline, https://www.healthline.com/health/suprapubic-pain#:~:text=Suprapubic%20pain%20happens%20in%20your,before%20diagnosing%20the%20underlying%20cause.

[54] Magnetic resonance cholangiopancreatography is a technique used by physicians to view the bile and pancreatic ducts using magnetic resonance imaging. Additionally, it can show physicians the pancreas, gallbladder, and liver. myDr, https://www.mydr.com.au/tests-investigations/magnetic-resonance-cholangiopancreatography-

20-CV-917-WVG

esophagogastroduodenoscopy (EGD)[55] and colonoscopy[56] with anesthesia, breath test for small intestinal bacterial overgrowth (SIBO),[57] and labs. (AR 1489.) In February 2018, Plaintiff was again tested for adrenal insufficiency and was found to be negative for adrenal insufficiency. (AR 1434.) The physician also recommended tapering Plaintiff off hydrocortisone.[58] (*Id.*) Then, Plaintiff returned to Advanced Pain & Rehab Center of San Diego for a pain management consultation follow-up. (AR 2354.) The physician noted: "Patient continued to state that with the use of his oral pain medications, he is able to function well with ADLs[59] with no adverse reactions or side effects noted." (AR 2354.)

He returned to Family Health Centers on March 13 reporting that he was still experiencing vertigo. (AR 1403.) Additionally, Plaintiff reported experiencing tremors in his hands and legs on occasion. (AR 1453.) He also had sudden cramping or loss of strength in hands on occasion. (*Id.*) On this same day, a colonoscopy was performed. (AR 1368.)

_____

mrcp/#:~:text=Magnetic%20resonance%20cholangiopancreatography%20(MRCP)%20is
,of%20these%20ducts%20and%20organs.

[55] An esophagogastroduodenoscopy is utilized by physicians to analyze the lining of the esophagus, stomach, and first part of the small intestine. To perform the procedure, the physician runs an endoscope through the esophagus into the stomach. Medline Plus, https://medlineplus.gov/ency/article/003888.htm.

[56] A colonoscopy is a routine procedure used to determine whether there are abnormalities in the large intestine and rectum. Mayo Clinic, https://www.mayoclinic.org/tests-procedures/colonoscopy/about/pac-20393569.

[57] Small intestinal bacterial overgrowth is an overall increase in the bacterial population in the small intestine. Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/small-intestinal-bacterial-overgrowth/symptoms-causes/syc-20370168.

[58] Hydrocortisone is used to treat redness, swelling, itching, and discomfort. Medline Plus, https://medlineplus.gov/druginfo/meds/a682793.html.

[59] "ADL" stands for activities of daily living.

The preliminary impression revealed a normal colon and terminal ileum (TI)[60] with small internal hemorrhoids.[61] (*Id*.) A biopsy was taken. (*Id*.)

In April 2018, a physician reviewed what was likely causing the Plaintiff's syncopal episodes. (AR 1354.) The physician believed these episodes of lightheadedness were due to dehydration with blood sugars in the 400s not adrenal insufficiency. (*Id*.) The physician informed Plaintiff that: "He needs to get better diabetes control to avoid dehydration." (*Id*.) On April 27, the Plaintiff was transitioned from oxycodone to dilaudid[62] by his pain management team at the Advanced Pain & Rehab Center. (AR 2329.) On April 30, Plaintiff went to Allsing Orthopedics for a consultation for his right hip pain and was diagnosed with Trochanteric bursitis in the right hip.[63] (AR 1338.)

In June 2018, Plaintiff began to have biweekly appointments with the pain management team at the Advanced Pain & Rehab Center because Plaintiff had not acquired paperwork from a psychological evaluation to clear him for opiate use. (AR 2317.) According to the report, Plaintiff came to the appointment complaining of pain and

_____

[60] The terminal ileum is the segment of the small bowel that connects with the colon. Radiopaedia, https://radiopaedia.org/articles/terminal-ileum?lang=us#:~:text=The%20terminal%20ileum%20(plural%3A%20ilea,colon%20through%20the%20ileocecal%20valve.

[61] Hemorrhoids are swollen veins in the lower rectum and anus. Hemorrhoids are very common amongst adults and may cause swelling, itching, or pain or discomfort. Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/hemorrhoids/symptoms-causes/syc-20360268.

[62] Dilaudid is a medication prescribed to treat moderate to severe pain. Medline Plus, https://medlineplus.gov/druginfo/meds/a682013.html.

[63] "Trochanteric bursitis is inflammation (swelling) of the bursa (fluid-filled sac near a joint) at the outside (lateral) point of the hip known as the greater trochanter. When this bursa becomes irritated or inflamed, it causes pain in the hip. This is a common clause of hip pain." Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/4964-trochanteric-bursitis.

cramping in the feet due to old injuries. (*Id*.) Additionally, Plaintiff was complaining of right hip pain. (*Id*.) He stated this pain got worse with activity and would radiate down his right thigh. (*Id*.) On June 13, an electroencephalogram (EEG)[64] was performed. (AR 1244.) Based on this study, epilepsy[65] could not be ruled out. (*Id*.) At the end of June, Plaintiff returned to Advanced Pain & Rehab Center for his biweekly appointment. (AR 2307.) He was informed by his pain team that if he wanted to continue to take opiates for his pain, he had to stop drinking. (*Id*.)

In July 2018, an electromyography (EMG)[66] and a nerve conduction velocity test (NCV)[67] was performed. The report from these studies reveal: "This is an abnormal electrophysiological study with evidence of: (1) Bilateral superficial peroneal[68] sensory

---

[64] An electroencephalogram is a test that looks at the electrical activity of the brain using electrodes. It is often used by physicians to diagnose epilepsy and other brain disorders. Mayo Clinic, https://www.mayoclinic.org/tests-procedures/eeg/about/pac-20393875.

[65] Epilepsy is a disorder, which causes recurrent seizures. Epilepsy Foundation, https://www.epilepsy.com/learn/about-epilepsy-basics/what-epilepsy.

[66] An electromyography is utilized by physicians to measure muscle response in order to discover any neuromuscular abnormalities. In order to conduct this test, the physician places one or more needles through the skin into the muscle, and the electrical activity is then displayed on an oscilloscope. John Hopkins, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/electromyography-emg.

[67] A nerve conduction velocity test is utilized by physicians to determine whether there is damage or injury to the nerves. The physicians electrically stimulate the nerves and the measure the electrical impulse from the stimulus. Medicine Net, https://www.medicinenet.com/nerve_conduction_velocity_test/article.htm.

[68] Peroneal nerve impacts the sensations in the front and sides of the legs and to the top of the feet. John Hopkins, https://www.hopkinsmedicine.org/health/conditions-and-diseases/peroneal-nerve-injury#:~:text=The%20common%20peroneal%20nerve%20branches,the%20ankle%20and%20toes%20upward.

axonal mononeuropathy;[69] (2) Left sural sensory axonal mononeuropathy; (3) Lumbosacral radiculopathy[70] and mononeuropathy multiplex[71] should be considered as additional differential diagnosis." (AR 1239.) On July 13, Plaintiff began physical therapy for his right hip pain. (AR 1083.) On July 17, Plaintiff returned to Family Health Centers of San Diego reporting fluctuating blood sugars, itchiness in the back of his legs and groin with red spots, and foot pain upon walking. (AR 1414.)

At the start of August 2018, an MRI was performed on Plaintiff and the final findings from Plaintiff's EMG & NCV were reported. (AR 1059, 1053.) The MRI conclusion stated:

> (1) No acute intracranial abnormality. Normal appearance of the intracranial vasculature. (2) Moderate periventricular and subcortical T2 and FLAIR hyperintensities throughout the Cerebral. White matter are nonspecific. While these are most commonly attributed to chronic hypertension or small vessel ischemic disease, in a patient of this age other etiologies such as demyelinating disease or vasculitis are not excluded. Correlate with clinical history.

(AR 1059.)

The final EMG & NCV impression revealed: "This is an abnormal electrophysiological study with evidences of mild right median nerve entrapment at flexor

---

[69] "Mononeuropathies are a form of peripheral neuropathy characterized by sensory disturbances and/or motor deficits in the distribution of the affected nerve. They can occur secondary to direct trauma, compression, stretch injury, ischemia, infection, or inflammatory disease." Medscape, https://emedicine.medscape.com/article/1141734-overview.

[70] Lumbar radiculopathy is a disease of the lumbar spinal nerve root. This is normally caused by the compression of the nerve root, and can cause pain numbness, or weakness in the legs. Emory Healthcare, https://www.emoryhealthcare.org/orthopedics/lumbar-radiculopathy.html.

[71] Mononeuritis multiplex is a form of peripheral neuropathy that occurs when two or more different nerve areas are damaged. American Association of Neuromuscular & Electrodiagnostic Medicine, https://www.aanem.org/Patients/Muscle-and-Nerve-Disorders/Mononeuritis-Multiplex#:~:text=Mononeuritis%20multiplex%2C%20also%20known%20as,rather%20than%20its%20own%20disease.

retinaculum, e.g. carpal tunnel syndrome (CTS) affecting sensory component only." (AR 1053.)

On August 16, 2018, Plaintiff returned for a physical therapy appointment to work on his right hip. (AR 1078.) A subjective examination was performed, which noted thirty percent perceived improvement. (*Id*.) According to the comments, pain had not changed during activities of climbing stairs, forward bending, getting in or out of an automobile, transitioning from standing to sitting, standing, and walking. (*Id*.) Additionally, Plaintiff still struggled with recreational activities. (*Id*.) His walking tolerance was one-fourth of a mile with a standing tolerance of twenty minutes. (*Id*.) When Plaintiff returned to physical therapy later in the month, he reported a decrease in pain with exercise activity. (*Id*.)

In August 2018, Plaintiff underwent two studies. (AR 1052, 2208.) On August 17, an EEG recording with electronic spike detection was performed. (AR 1052.) Based on this, the physicians could not rule out epilepsy. (*Id*.) On August 31, the Palomar Health emergency room performed an image-guided lumbar puncture[72] after Plaintiff returned with abdominal pain and pain in the neck, left shoulder, and left hip. (AR 2208.) He was later discharged on September 2, 2018 with a diagnosis of alcoholic ketoacidosis.[73] (AR 2215.) On this same visit to Palomar Health, a shoulder x-ray of the left shoulder, head CT, CT of the cervical spine, CT of the abdomen/pelvis, and CT of the lumbar spine were

_____

[72] "Fluoroscpoy-guided lumber puncture (LP) is a minimally invasive, image-guided diagnostic and therapeutic procedure that involves the removal of a small volume of cerebrospinal fluid (CSF) from, or an injection of medication or other substance (e.g. radiotracer, chemotherapy agents) into the lumbar cistern of the spinal column." Radiopaedia, https://radiopaedia.org/articles/fluoroscopy-guided-lumbar-puncture-1?lang=us.

[73] Ketoacidosis is caused by the build-up of ketone bodies in the bloodstream. When a person consumes alcohol, the pancreas may stop producing the insulin needed for cells to use glucose to consume energy, and the body will start to burn fat. When the body burns fat, ketone bodies are produced, and without insulin, these ketone bodies will build-up in the bloodstream. Healthline, https://www.healthline.com/health/alcoholism/ketoacidosis.

performed. (AR 2219-21.) The left shoulder x-ray revealed a normal left shoulder. (AR 2219.) Further, the head and cervical spine came back negative. (*Id.*) A CT of the abdomen/pelvis revealed a "diffuse colonic wall thickening which may be due to nondistention or colitis."[74] (AR 2220.) Additionally, the CT of the lumbar spine came back negative. (AR 2221.) The physician noted: "Patient's imaging revealed no acute abnormality. He was given a meal and received normal saline 3L IV after which labs were rechecked. His creatinine improved however his acidosis and ketonemia worsened. I suspect alcoholic ketoacidosis." (*Id.*)

Plaintiff complained of headaches throughout October 2018. (AR 1394, 1390, 1175.) The physicians believe this was caused by dehydration after binge drinking. (AR 1182.) In November 2018, Plaintiff received a consultation from Balboa Nephrology Medical Group for renal insufficiency. (AR 1067.) The physician noted: "Chronic kidney disease stage III is post partial right nephrectomy for renal cell cancer as well as a long history of hypertension possibly with underlying nephrosclerosis[75] as well as a history of type 2 diabetes mellitus." (AR 1070.)

In January 2018, Plaintiff went to another psychiatric follow-up with Claudio Cabrejos MD. (AR 1305.) Dr. Cabrejos listed the Plaintiff's symptoms as mild. (AR 1306-1307.) In March 2018, an adult behavioral assessment was performed by Jarvis Bartlett

---

[74] Colitis is the inflammation of the colon lining. Medical News Today, https://www.medicalnewstoday.com/articles/what-is-colitis#what-is-it.

[75] "The term hypertensive nephrosclerosis has traditionally been used to describe a clinical syndrome characterized by long-term essential hypertension, hypertensive retinopathy, left ventricular hypertrophy, minimal proteinuria, and progressive kidney failure. Most cases are diagnosed solely on clinical findings. In fact, most of the literature dedicated to hypertensive nephrosclerosis is based on the assumption that progressive kidney failure in a patient with long-standing hypertension, moderate proteinuria, and no evidence suggesting an alternative diagnosis characterizes hypertensive nephrosclerosis. Medscape, https://emedicine.medscape.com/article/244342-overview#:~:text=Coined%20almost%20a%20century%20ago,describe%20the%20same%20clinical%20condition.

PSY. (AR 1298.) Upon this evaluation, Bartlett listed the Plaintiff's symptoms as moderate. (AR 1302.) In March 2018, Plaintiff returned to speak with Jarvis Bartlett PSY. (AR 1296.) The Plaintiff indicated that he was unwilling to enroll in individual therapy despite feeling as though he was not receiving enough attention from Dr. Cabrejos. (*Id*.) Plaintiff stated that he had continued to experience panic attacks, depression, and anxiety. (*Id*.) Bartlett recommended that Plaintiff attend individual, supportive therapy. (*Id*.) At the end of March, Plaintiff returned to meet with Dr. Cabrejos. (AR 1292.) Dr. Cabrejos described Plaintiff as experiencing only mild symptoms. (AR 1293-1294.) When Plaintiff returned to Dr. Cabrejos in May, Dr. Cabrejos again listed that Plaintiff was only experiencing mild psychiatric symptoms. (AR 1289.) In August 2018, Dr. Cabrejos continued to consider Plaintiff as having only mild symptoms of anxiety and depression. (AR 1281-82.) In October 2018, Dr. Cabrejos considered Plaintiff's symptoms to be moderate, which indicated that the Plaintiff was not improving. (AR 1276-77.)

**C.     Consultative Examining Expert Evidence**

The medical record was reviewed by George Spellman, Jr., MD and Heather Abrahimi, PsyD. (AR 78-81.) Dr. Spellman listed Plaintiff's medically determinable impairments as diabetes mellitus, essential hypertension, chronic kidney disease, affective disorders, anxiety disorders, and substance addiction disorder. (*Id*.) Each of these impairments was listed as non-severe. (*Id*.)

Plaintiff failed to attend his appointment with Dr. Abrahimi for a psychiatric evaluation. (*Id*.) Dr. Abrahimi analyzed the medical records for depressive, bipolar, and related disorders. (*Id*.) Dr. Abrahimi determined there was insufficient evidence to prove the presence of a disorder. In the Personalized Disability Explanation (PDE), the physicians noted:

> In order to be entitled for benefits your condition must be found to be severe prior to 06/30/2015. The evidence in file is not sufficient to fully evaluate your claim and the evidence needed cannot be obtained. We have determined your condition was not disabling on any date through 06/30/2015, when you were last insured for disability benefits. In deciding this, we considered the medical

records, your statements, and how your condition affected your ability to work.

(AR 81.)

**D.    Plaintiff's Testimony**

Plaintiff testified that he has been using a walker since undergoing a hip replacement in 2016. (AR 39.) This was not revealed in the medical records because he typically took an ambulance to the hospital as he was no longer driving. (*Id*.) Plaintiff stopped driving himself because his medications were making him drowsy, and he would occasionally experience blurred vision. (*Id*.)

Additionally, Plaintiff testified he was experiencing cluster headaches. (AR 43.) According to his testimony, these headaches occur about once a month. (*Id*.)

Plaintiff then spoke to how his mental disorders impacted him:

> Sometimes I don't feel like getting out of bed, and when I do have - - when I'm feeling forced to go do something, the anxiety level's so high sometimes I start getting panicky and there's a lot of things I end up not achieving or getting done because of the anxiety issues. And I'll just blow them off and say I- - I can't do this. ADHD, very difficult to deal with, it's like your brain won't turn off. It's - - your brain's like always one step ahead of your body and you - - you forget stuff a lot and going to sleep is nearly impossible sometimes I just - - it's hard to concentrate. It's hard for me to read - - to read, you know.

(AR 45.)

Plaintiff testified that these mental health difficulties would make it hard to complete repetitive tasks assigned to him at work. (*Id*.) Further, Plaintiff discussed the nerve damage and arthritis in his hands and feet. (AR 48.) This made it difficult for him to walk or grip. (*Id*.) He testified that this caused his hands to feel numbness, pain, and cramping. (*Id*.)

**E.    ALJ's Findings**

At step one of the sequential evaluation process described above, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset date, April 1, 2015. (AR 21.) At step two, the ALJ found the following severe impairments: a history of seizures; chronic kidney disease, stage III; residuals of right hip replacement;

degenerative changes of the cervical spine; a history of headaches; and a history of pancreatitis. (*Id*.) At step three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 23.)

Between steps three and four, the ALJ assessed Plaintiff's residual functional capacity. (*Id*.) The ALJ determined Plaintiff could perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b) except and meaning the claimant could:

> lift and carry ten pounds frequently and twenty pounds occasionally; sit, stand, or walk for six hours each in an eight-hour workday and push/pull to the same weight limits; except he occasionally could climb stairs and ramps, stoop, kneel, crouch, and crawl. He should not climb ladders, ropes, and scaffolds. He should avoid concentrated exposure to loud noise and extreme cold. He should avoid all exposure to work at unprotected heights and around moving and dangerous machinery.

(AR 23, citing 20 C.F.R. §§ 404.1567; 416.967.)

Based on the RFC, the ALJ determined at step four that Plaintiff could not perform his past relevant work. (AR 27.) At step five, the ALJ found that there were other jobs that Plaintiff could perform. (*Id*.)

## III.   STANDARD OF REVIEW

A federal district court will not change the decision of the Commissioner unless the decision is not supported by substantial evidence or is based on legal error. *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla" and requires only that evidence be provided which "a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019); *see also Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020). The ALJ has the responsibility of determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). In cases where the evidence can be rationally interpreted in more than one way, the ALJ's conclusion shall be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## IV.   DISCUSSION

Plaintiff challenges the ALJ's unfavorable decision on four separate grounds, arguing that (1) the ALJ did "not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination," (2) the ALJ incorrectly found Plaintiff did not need a walker device and that his neuropathy "would improve with the cessation of alcohol use," (3) the ALJ did not discuss the Plaintiff's hand issues, and (4) the fact of alcohol use "alone" does not justify the ALJ's negative credibility assessment. The Court addresses each of Plaintiff's four arguments in turn.

An ALJ is "not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair*, 885 F.2d at 603. Further, the statements of a claimant as to their pain levels will not be considered conclusive evidence of a disability. 42 U.S.C. § 423(d)(5)(A); *see also* 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain will not alone establish that you are disabled."). When determining whether to credit a claimant's testimony regarding pain, the ALJ utilizes a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The ALJ must first look to whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* (quoting *Lingenfelter v. Astrue*, 504 F. 3d 1028, 1036 (9th Cir. 2007). If there is objective medical evidence, and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting a claimant's testimony. *Id.* The ALJ may consider the following factors to determine credibility of a claimant's allegations of pain: daily activities; nature, location, onset, duration, frequency, radiation, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side-effects of medication; treatment other than medication; and functional restrictions. *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991); *see also Bray v. Comm'r of SSA*, 554 F.3d 1219, 1226-27 (9th Cir. 2009).

Here, the ALJ found "the claimant's medically determinable impairments reasonably could be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 24.) The ALJ then proceeded with a detailed recitation of the medical record. It is the task of this Court to determine if the ALJ's findings on the effects of Plaintiff's pain is supported by substantial evidence under the clear and convincing standard. *Carmickle v. Comm'r, SSA*, 533 F.3d 1155, 1161 (9th Cir. 2008). Under *Bunnell*, "once the claimant produces objective medical evidence of an underlying impairment, an adjudicator *may not* reject a claimant's subjective complaints *based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain*." 947 F.2d at 345 (emphasis added). As the Ninth Circuit has long held—and as the SSRs have continually guided—an ALJ cannot rely solely on medical records to discount subjective pain claims. Here, however, that is precisely what the ALJ did: his extensive recitation of the medical evidence was the sole basis cited for rejecting Plaintiff's pain testimony. The ALJ did not articulate additional factors[76] he believed discredited the claimant's testimony. Without citing any other factors, the ALJ's credibility determination was based solely on the medical record and, as a result, was erroneous.

Next, the ALJ did not take Plaintiff's neuropathy into consideration because "the claimant's neuropathy is subject to improvement with medical treatment and potentially with cessation of alcohol abuse/use." (AR 26.) Because the neuropathy had only been diagnosed eight months prior to the decision and the ALJ believed this condition would improve, the ALJ found it would not meet the twelve-month durational requirement. (*Id.*)

---

[76] *See Bunnell*, 947 F.2d at 446 (enumerating factors: daily activities; nature, location, onset, duration, frequency, radiation, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and adverse side-effects of medication; treatment other than medication; and functional restrictions); SSR 16-3p(d).

This assertion, however, is not supported by the medical record. In order to meet the durational requirement, an impairment must have lasted *or can be expected to last* for a continuous period of not less than 12 months. 20 C.F.R. § 404.1505. Given the record and Plaintiff's testimony, his neuropathy could have been expected to last not less than 12 months. Although Plaintiff underwent surgery for his pancreatitis in June 2016, he continued to return to the Palomar Health emergency room, Family Health Centers, and UCSD reporting abdominal pain, epigastric pain, and nausea throughout 2016 and 2017. (AR 388, 407, 993-94, 1952, 1002, 1890, 1810.) Further, following his procedure in 2016, Plaintiff reported numbness in his feet as well as lower extremity weakness. (AR 407.) Plaintiff's testimony indicated that he was still experiencing symptoms from his neuropathy on a regular basis, and no evidence in the medical records indicate likely improvement. Thus, given the lack of medical evidence that Plaintiff's neuropathy was subject to improvement with medical treatment, the condition could potentially be expected to continue and thus meet the durational requirement. Additionally, the ALJ's suggestion that the neuropathy was "subject to improvement . . . potentially with cessation of alcohol abuse/use" was speculation and not supported by the medical record.[77] The ALJ did not necessarily have to include this impairment in his RFC, but he at the very least had to address it. 20 C.F.R. § 404.1545(a)(3),(e) (requiring the ALJ to consider a claimant's impairments, including those considered non-severe, as well as relevant evidence in determining the claimant's RFC); *Miguel A.V. v. Saul*, No. 20CV1560-AFM, 2021 U.S. Dist. LEXIS 127620, at *4-5 (C.D. Cal. July 8, 2021) ("So long as the ALJ specifies reasons — supported by substantial evidence — for not including the non-severe impairment, the ALJ has not committed a legal error."). Accordingly, the ALJ erred by not addressing Plaintiff's neuropathy claim.

---

[77] Because the ALJ did not cite to the record, it is not known what evidence the ALJ based this statement upon.

Additionally, although the ALJ stated there was no medical order for a walker, the Plaintiff was instructed to use a front wheeled walker because the numbness in his feet and lower extremity weakness caused him to fall consistently. (*Id*.) And according to Plaintiff's testimony, he continued to use this walker throughout the disability period. (AR 39.) Accordingly, the ALJ erred in dismissing Plaintiff's use of a walker on the basis that the record contained no evidence of such a requirement.[78]

Next, the ALJ also erred when he did not discuss the issues Plaintiff identified with his hands. Plaintiff was diagnosed with mild carpel tunnel syndrome in August 2018, (AR 1053), and he testified at the ALJ hearing that his hand issues have resulted in numbness, cramping, an ability to grip objects, and he has dropped objects (AR 48). Plaintiff stated that his "hands get to where [he] can't grip." (AR 48.) In his testimony, he indicated that he experiences these symptoms about once a week. (*Id*.) However, the ALJ did not specifically address these issues in his RFC assessment. Although Plaintiff's carpel tunnel was admittedly mild—not severe—and he testified that he experienced these issues relatively infrequently, the ALJ was nonetheless required to at least address this condition. The ALJ ostensibly addressed this impairment briefly when he indicated that "[a]lthough none of these medical issues is described in terms that indicate severity, any effects were taken into consideration in the residual functional capacity." (AR 22.) However, this generic discussion is not sufficient. Accordingly, the ALJ erred when he did not address the issues Plaintiff identified related to his hands.

Finally, Plaintiff contends that the fact that Plaintiff "consumes" alcohol "alone does not lend itself to fall into any of the six factors to be considered in weighing [his] credibility because [he] has not lied about it." (Doc. No. 19-1 at 8.) However, this argument confuses the issue. As an initial matter, the ALJ did not use Plaintiff's alcohol consumption as the

---

[78] The Court's finding here does not necessarily mean that the ALJ should have included the use of a walker in his RFC assessment. The Court simply finds that the ALJ's statement about the lack of medical evidence in the record was incorrect. On remand, the ALJ is free to reconsider the walker issue *de novo*.

only factor in his credibility assessment. Thus, the underlying assumption for this argument—that the ALJ considered only Plaintiff's alcohol consumption—is off base. Additionally, while Plaintiff asserts alcohol usage is not one of the six factors the SSA may consider, it certainly appears that alcohol usage could be considered under the following catch-all factor ALJs may consider in evaluating the intensity and persistence of a claimant's pain symptoms: "Other factors concerning your functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(vii). Plaintiff does not cite any authority that specifically prohibits considering a claimant's alcohol usage. Accordingly, the ALJ did not err when he factored in Plaintiff's alcohol usage.

Having found that the ALJ erred, this Court must determine whether this was harmless error. The errors of an ALJ are harmless in social security cases if they are "inconsequential to the ultimate nondisability determination." *Stout v. Comm'r, Soc. Sec. Admin*, 454 F.3d 1050, 1055-56 (9th Cir. 2006.) However, "where harmlessness is clear and not a borderline question, remand for reconsideration is not appropriate." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011), superseded on other grounds 20 C.F.R § 404.1504.

Here, the ALJ's errors are not clearly harmless. The ALJ assigned Plaintiff the following RFC, in relevant part: "lift and carry ten pounds frequently and 20 pounds occasionally; sit, stand, or walk for six hours each in an eight-hour workday and push/pull to the same weight limits; except he occasionally could climb stairs and ramps, stoop, kneel, crouch, and crawl." Because the errors here potentially conflict with Plaintiff's ability to perform many of these tasks, the errors are not harmless. For example, Plaintiff's carpel tunnel and the hand issues he described directly implicate his ability to lift and carry objects. And his use of a walker, if credited, would impact his ability to stand or walk for six hours in an eight-hour workday. These conditions, if credited, could also impact his ability to even occasionally climb stairs and ramps. Finally, if the ALJ cannot cite anything other than the medical record to discount Plaintiff's testimony, the ALJ might re-evaluate

the RFC in its entirety.[79] As a result, the errors here are not harmless, and remand for further consideration is appropriate.

## V.    CONCLUSION

Based on the foregoing. Plaintiff's MSJ is GRANTED and Defendant's Cross-MSJ is DENIED. The Clerk of Court is instructed to enter judgment accordingly. The case is remanded for further proceedings.

IT IS SO ORDERED.

DATED: August 26, 2021

_____
Hon. William V. Gallo
United States Magistrate Judge

---

[79] For example, throughout 2017, Plaintiff was experiencing syncope episodes. These episodes caused him to lose consciousness and fall frequently. (AR 1985, 1708, 1741, 1136, 1229, 2090, 2094.)